1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11 | BEVERLY HADRICK,

CASE NO.  08cv954-BEN (WMc)

12 | 　　　　　　　　　　　Plaintiff,

REPORT AND
RECOMMENDATION DENYING
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S CROSS
MOTION FOR SUMMARY
JUDGMENT

13 | 　　vs.

14 | MICHAEL ASTRUE, Commissioner of
Social Security,

15

16 | 　　　　　　　　　　　Defendant.

17

## INTRODUCTION

18

19    Plaintiff Beverly Hadrick (hereinafter Plaintiff) brings this action pursuant to section

20 405(g) of the Social Security Act, 42 U.S.C. § 1383 (c)(3)[1] to obtain judicial review of a final

21 decision of the Commissioner of Social Security ("Commissioner") denying her claim for Social

22 Security Disability Insurance Benefits ("SSDI") under Title II and Title XVI of the Social Security

23 Act ("Act"), 42 U.S.C §§ 1381, et seq.  Plaintiff has filed a motion for summary judgment.  In that

24 motion, Plaintiff argues she should have been found "disabled" under the Act and the Appeals

25 Council's decision adopting the Administrative Law Judge's ("ALJ") decision of July 28, 2005

26 denying her benefits should be reversed because the ALJ's decision is not supported by substantial

27

28

---

[1] 42 U.S.C. § 1383(c)(3) provides:
　　The final determination of the Commissioner of Social Security after a hearing [to determine eligibility or amount of benefits] shall be subject to judicial review as provided in section 405(g) of this title...

1   evidence and is based on legal error.  The Commissioner filed a cross-motion for summary

2   judgment.  In the motion, the Commissioner argues the ALJ's decision is supported by substantial

3   evidence and is not based on legal error.

4   **PROCEDURAL HISTORY**

5       Plaintiff filed an application for supplemental security income payments on April 29, 2003.

6   (A.R. at 758.) The claim was denied initially and then again on reconsideration.  Plaintiff filed a

7   request for a hearing and her claim was denied by decision on July 28, 2005.  Plaintiff

8   subsequently filed an additional application for supplemental security income payments on

9   December 28, 2005. (Id.) Plaintiff is alleging disability since January 17, 2001, on both

10  applications.  Plaintiff  filed a request for review of the decision that was denied by the Appeals

11  Council on March 17, 2006.  Plaintiff subsequently filed an appeal with the United States District

12  Court Southern District of California.  On September 5, 2007, Plaintiff's appeal was granted and

13  the decision was remanded for further consideration. (Id.)

14       On remand and after two more hearings the ALJ issued a decision on March 26, 2008.

15  The ALJ found Plaintiff was disabled from December 1, 2003 through March 1, 2005.  (A.R. at

16  762.) October 21, 2008, the appeals counsel declined to assume jurisdiction.  On November 30,

17  2009, Plaintiff filed a Motion for Summary Judgment. (Doc. No. 20.) On January 4, 2010,

18  Defendant filed a Cross Motion for Summary Judgment and Response in Opposition to Plaintiff's

19  Motion for Summary Judgment. (Doc. No. 21.)

20  **FACTUAL BACKGROUND**

21       Plaintiff was born July 30, 1960;  at the alleged onset of her disability Plaintiff was forty-

22  two years old. (A.R. at 754.)   Plaintiff has a twelfth grade education and is able to read and

23  communicate in English.  (A.R. at 755.)  Plaintiff has no transferable job skills due to a lack of

24  past relevant work experience.  (Id.)

25       At the August 2007 hearing Plaintiff testified she cannot work due to (a) joint disease of

26  the knee, (b) back pain, (c) asthma and (d) carpal tunnel syndrome. (A.R.at 835.)   Plaintiff states

27  she receives Workers Compensation (Id.)

28  *///*

**LEGAL STANDARD**

The supplemental security income program established by Title XVI of the Act provides benefits to disabled persons without substantial resources and little income. 42 U.S.C. § 1383.  To qualify, a claimant must establish an inability to engage in "substantial gainful activity" because of a "medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  The disabling impairment must be so severe that, considering age, education, and work experience, the claimant cannot engage in any kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1382(a)(3)(B).

The Commissioner makes this assessment by a five-step analysis.  First, the claimant must currently not be working. 20 C.F.R. § 416.920(b).  Second, the claimant must have a "severe" impairment. 20 C.F.R. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude work.  20 C.F.R. § 416.920(d).  If the claimant's impairment meets or equals one of the listed impairments, benefits are awarded. 20 C.F.R. § 416.920(d).  Fourth, if the claimant can do his past work, benefits are denied. 20 C.F.R. § 416.920(e).  Fifth, if the claimant cannot do his past work and, considering the claimant's age, education, work experience, and residual functional capacity, cannot do other work that exists in the national economy, benefits are awarded.  20 C.F.R. § 416.920(f).  The last two steps of the analysis are required by statute. 42 U.S.C. § 1382(a)(3)(B).

In addition, when evaluating the severity of a claimant's alleged mental impairments, the Commissioner uses a "special technique" at each level of the review process. 20 C.F.R. § 416.1520a.  In order to be considered disabled under the Act, the claimant must have: (1) a medically determinable mental impairment(s), 20 C.F.R. § 416.1520a(b)(1)[2], and (2) exhibit specified functional limitations as a result of that impairment(s) which prohibit the claimant from engaging in any gainful activity. 20 C.F.R. § 416.1520a(b)(2).  If the claimant has a medically

---

[2] There are nine diagnostic categories that the Act considers to be medically determinable mental impairment(s): Organic mental disorders (12.02); schizophrenic, paranoid, and other psychotic disorders (12.03); affective disorders (12.04); mental retardation (12.05); anxiety related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10). 20 C.F.R.Pt. 404, Subpt. P, App. 1 § 12.00.A.

1    determinable mental impairment but does not exhibit the requisite functional limitations, the

2    claimant may nevertheless still be considered disabled if the claimant exhibits clusters of

3    symptoms or a syndrome indicating an inability to engage in gainful activity. 20 C.F.R. §

4    404.1520a(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.A. (impairment(s) must either pose

5    functional limitations or cause symptoms or a syndrome to support a finding of disabled).

6        Sections 405(g) through 1383(c)(3) of the Act, allow unsuccessful applicants to seek

7    judicial review of a final agency decision of the Commissioner. 42 U.S.C. §§ 1383(c)(3), 405(g).

8    The scope of judicial review is limited, however, and the Commissioner's denial of benefits "will

9    be disturbed only if it is not supported by substantial evidence or is based on legal error." *Brawner*

10   *v. Secretary of Health and Human Services*, 839 F.2d 432, 433(9th Cir. 1988) (*quoting Green v.*

11   *Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).

12       Substantial evidence means "more than a mere scintilla" but less than a preponderance.

13   *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).  "[I]t is such relevant evidence as a

14   reasonable mind might accept as adequate to support a conclusion." *Id.* (*quoting Andrews v.*

15   *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the record as a whole,

16   weighing both the evidence that supports and detracts from the Commissioner's conclusions.

17   *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576, (9th Cir. 1988).  If the

18   evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.

19   *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  When the evidence is inconclusive, "questions

20   of credibility and resolution of conflicts in the testimony are functions solely of the Secretary."

21   *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982).

22       The ALJ has a special duty in social security cases to fully and fairly develop the record in

23   order to make an informed decision on a claimant's entitlement to disability benefits. *DeLorme v.*

24   *Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).  Because disability hearings are not adversarial in

25   nature, the ALJ must "inform himself about the facts relevant to his decision," even if the claimant

26   is represented by counsel. *Id.* (*quoting Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983)).

27       Even if the reviewing court finds substantial evidence supports the ALJ's conclusions, the

28   court must set aside the decision if the ALJ failed to apply the proper legal standard(s) in weighing

the evidence and reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).
Section 405(g) permits a court to enter a judgment affirming, modifying or reversing the
Commissioner's decision. 42 U.S.C. § 405(g).  The reviewing court may also remand the matter to
the Social Security Administrator for further proceedings. *Id.*

**DISCUSSION**

**Medical Evidence Presented**

In order to understand Plaintiff's alleged medical problems a review of her relevant
medical history is presented here.

**Dr. Thomas Harris, M.D. (orthopedic surgeon)-Treating physician (2001-2005)**

-March 7, 2001:   Plaintiff began seeing Dr. Harris for a swollen left knee . (A.R. at 752.)
At that time, Plaintiff complained of a swollen left knee. (A.R. at 752 .)  She reported having
undergone three prior surgeries on her left knee before she had another knee injury in  January
2001.  She reported she had no work restrictions related to her knee as a result of those surgeries.
Dr. Harris diagnosed a sprain/strain of the left knee, referred Plaintiff for an MRI, prescribed
Tylenol with Codeine #3 and placed Plaintiff on temporary total disability status.  (A.R. at 752 .)

-April 18, 2001: Dr. Harris performed arthroscopic surgery on Plaintiff's left knee. (A.R. at
373.)

-September 2001: Plaintiff reported her right knee was starting to bother her because she
was having to compensate for her left knee.  (A.R. at 755.)

-November 27, 2001: Dr. Harris prepared a "Treating Physician Permanent and Stationary
Report."  He stated Plaintiff would require future medical care, including anti-inflammatory pain
medications, physical therapy, Synvisc injections and, additional arthroscopic chondroplasties and
eventually a total knee arthroplasty due to significant chondral damage in Plaintiff's left knee.
(A.R. at 755 ).

-April 2002: Dr. Harris reported Plaintiff continued to have ongoing symptoms.  He
recommended a series of Synvisc injections for Plaintiff's left knee. (A.R. at 375.)

-June 2002: Plaintiff reported having increased back and hip pain, with pain radiating into
both legs with numbness and tingling.  (A.R. at 373.)

-October 2002: Plaintiff reported having another fall in October 2002 due to her left leg "giving out" on her.  (A.R. at 375 .)  Dr. Harris prescribed physical therapy and crutches.

-November 2002: Plaintiff sustains another fall due to her knee.  Dr. Harris advises her to remain on crutches to keep from falling.  (A.R. at 375.)

-January 2003: Dr. Harris prescribed Lortab for Plaintiff's ongoing pain.  (A.R. at 375 .)

-February 2003: Plaintiff reported having significant pain in her low back radiating into her left leg, as well as trouble getting around and sitting.  (A.R. at 756.)   Plaintiff's primary case physician refers her to a neurologist who diagnoses carpal tunnel in the right hand.  (A.R. at 375 .)  Plaintiff 's gait is found by Dr. Harris to still be antalgic and very irregular.  She is also found to have back spasms and flattening of the lumbar spine. (A.R. at 756.)

-April 2003: A lumber MRI is performed showing degenerative disc disease at L5-S1 and a small central focal protrusion without spinal stenosis or neural foraminal narrowing. (A.R. at 756.)

-June 2003: Plaintiff complains of chronic lumbrosacral spine pain with burning into the left lower extremity, as well as burning in her right wrist.  (A.R. at 190.)  Plaintiff used Valium to control her muscle spasms.

-July 2003: Dr. Harris refers Plaintiff to Dr. David Kupfer M.D. (hand surgeon) for her upper extremity discomfort and to Dr. Denise Rubino, M.D. for possible epidural steroid injections to relieve Plaintiff's lower back discomfort.  (A.R. at 759.)

-October 2003: Plaintiff reported her left knee had given out and she had fallen down again, landing on her right wrist and injuring her right leg.  (A.R. at 543 .)

-November 2003:  Dr. Harris gives Plaintiff a series of three Synvisc injections in her left knee.

-December 2003: Dr. Kupfer performs carpal tunnel surgery.  (A.R. at 535.)

-January 2004: Dr. Harris observes Plaintiff was possibly developing Reflex Sympathy Dystrophy ("RSD") [3] of the right upper extremity.  (A.R. at 532 .)  Dr. Harris reports Plaintiff had been unable to work since 2001 due to the injuries she sustained in January 2001.

---

[3]  RSD is a chronic neurological syndrome resulting from an injury to a nerve or soft tissue that does not follow the normal healing path, and in which the sympathetic nervous system seems to assume an abnormal function after an injury.  *See Oldham v. Astrue*, 509 F.3d 1254, 1255 fn.1 (10th Cir. 2007).

-April 2004: Dr. Harris recommends Plaintiff see a pain management specialist.  Dr Harris recommends an MRI and possible arthroscopy on Plaintiff's right knee. (A.R. at 394.) However, her workman's compensation carrier denies the request on the basis her right knee problems are unrelated to her work related injury. (A.R. at 513-515 .)

-June 2004: Dr. Harris notes Plaintiff continues to have symptoms of RSD in her right upper extremity, burning left knee pain, and back pain.  (A.R. at 511.)  Dr. Harris also notes concern Plaintiff is having reactive depression secondary to her medical condition.  He suggests Plaintiff be seen by a psychiatrist. (A.R. at 511.)

-July 2004: Dr. Harris notes none of his recommendations for further treatments have been approved by Plaintiff's compensation carrier.  He asserts her treatment is being compromised by her inability to receive treatment for both her left and right knees.

-August 2004: Dr. Harris continues Plaintiff on her pain management regimen. (A.R. at 503.)  Dr. Harris states Plaintiff is not capable of performing sustained sedentary work on a regular and continuing basis. (A.R. at 506.)

-May 2005: Dr. Harris notee Plaintiff still had ongoing multiple orthopedic complaints involving her knees and upper extremities.

-August 2004 and May 2005 : Dr. Harris finds Plaintiff cannot lift any weight at all due to her bilateral carpal tunnel syndrome and ulnar neuropathy.  He states Plaintiff can stand and/or walk for less than 2 hours in an 8 hour workday, and could sit for 6 hours out of an 8 hour workday, but would need to alternate sitting and walking/standing every 15-20 minutes due to bilateral knee meniscus tears and chondromalacia, as well as chronic lumbar sprain with degeneration.  He also states Plaintiff's ability to push and pull is limited, and that she can never climb, balance, kneel, crouch, crawl, or stoop.  Finally he states Plaintiff's manipulative functions are impaired, such that she should never engage in reaching, handling, or fingering, and can engage in feeling only on an occasional basis.  (A.R. at 394-401.)

**David M. Kupfer, M.D. (hand surgeon) – Treating physician (2003–2004)**

-December 2003: Dr. Kupfer performs carpal tunnel release surgery on Plaintiff's right wrist.  (A.R. at 499.)

-January 2004: Plaintiff complains of increased frequent numbness and tingling in both hands.  (A.R. at 499.)

-March 2004:   Dr. Kupfer confirms RSD diagnosis and refers Plaintiff to Dr. Zimmer for ganglion blocks.

-May 2004: Dr. Kupfer notes Plaintiff's right hand and finger symptoms are significantly better following treatment with Dr. Zimmer. (A.R. at 513-515.)

-June 2004: Dr. Kupfer recommends Plaintiff receive a cervical MRI due to post-sympathetic block radiculitis.  (A.R. at 492.)

-September 2004: Plaintiff reports substantial improvement in her right hand and the post-surgical RSD has improved.  (A.R. at 501.)  Dr. Kupfer indicats Plaintiff is temporarily totally disabled pending surgery on her left arm.

-June 2005: Dr. Kupfer opines Plaintiff is not capable of performing sustained sedentary work on a regular and continuing basis. (A.R. at     .)

2005 - Present: According to Plaintiff's attorney, Plaintiff "has not seen Dr. Harris since 2005, but he continues to prescribe her medications because of her pain."  (A.R. at 835 citing the Supplemental Security Income Benefits Hearing August 27, 2007. )

**Denise Rubino, M.D.–Treating physician (2003)**

-October 2003: Plaintiff received lumbar epidural steroid injections by Dr. Rubino.  Dr. Rubino opined Plaintiff can sit, stand, and walk for only one hour each per day, and can not lift or carry any weight over five pounds. (A.R.at 362.)  She qualifies her opinion, however, by stating Plaintiff can be reassessed after treatment has been concluded.  (A.R.at 365.)

**Eric Zimmer, M.D.  – (pain management specialist) Treating physician (2004)**

-May 2004: Dr. Zimmer reports Plaintiff is suffering from a severe aggressive RSD in the right upper extremity, and should receive another series of ganglion blocks. (A.R.at 423-427.)

**Richard Greenfield, M.D.-- Examining Orthopedic Surgeon (2002–2003)**

-February/March 2002: Dr. Greenfield opines Plaintiff has achieved maximum medical benefit from active medical care with respect to her left knee.

-February 2003: Dr. Greenfield reevaluates Plaintiff's knee, hip, pelvis, and back

complaints.  He finds no further disability or restrictions in the left knee.  However, Plaintiff

requires ongoing conservative care, and the care provided by Dr. Harris was appropriate. (A.R. at

284.)  He also finds Plaintiff's injury to her left knee had causes her right knee, back and hip

problems.

-November 2003: A third evaluation of Plaintiff was done for her hand complaints.  Dr.

Greenfield finds it is possible her hand symptoms had been caused by using her crutches.  He

advises Plaintiff has a temporary partial disability due to her hands, and she can not do any

repetitive tasks such as typing, keying, fingering, grasping, lifting, carrying, pushing, or pulling.

He recommends nerve conduction studies in order to further evaluate Plaintiff's condition.  (A.R.

at 392.)

**Byron King, M.D. -Examining Orthopedic Surgeon (2003)**

-May 2003: On review of Dr. Harris' April 2001 report, Dr. King finds advanced

degenerative changes in Plaintiff's left knee.  He also finds Plaintiff requires appropriate treatment

for her hands, wrists, lower back, and right knee.  He does not believe Plaintiff's factors of

disability can be accurately rated without Plaintiff first reaching maximum medical improvement.

(A.R. at 370.)

**Steven Gerson, D.O.– Examining Internist (2002)**

-July 2003: Dr. Gerson performs an internal medicine evaluation of Plaintiff.  He notes

Plaintiff's chief complaints at that time are left knee pain and asthma.  Dr. Gerson opines Plaintiff

can lift up to 10 pounds frequently and 20 pounds occasionally, and can sit, stand, and walk for 6

hours in an 8 hour workday.  (A.R. at 313.)

**Thomas Sabourin, M.D. – Examining Orthopedic Surgeon (2004)**

-November 2004: After performing an orthopedic consultation, Dr. Saboruin finds : 1)

degenerative arthritis of the left knee, status post multiple knee surgeries; 2) bilateral carpal tunnel

syndrome, status post right carpal release; 3) reflex sympathetic dystrophy of the right upper

extremity, now improved; 4) cervical spine degenerative arthritis; and 5) lumbar spine

degenerative disc disease.  (A.R. at 436.)

Dr. Sabourin finds: "[H]er complaints are somewhat disproportionate to the determinable

condition....her complaints are much more vociferous than the actual physical examination."  (A.R. at 440.)

**Vocational Evidence Presented**

Vocational expert ("VE"), Gloria Lasoff , testified at the August 2007 hearing.  Based upon the vocational profile, residual functional capacity assessment and hypotheticals provided by the ALJ at that time, VE Lasoff, testified no former work is available to Plaintiff.  However, based upon her RFC and the hypotheticals presented she could perform eighty-five percent of the unskilled sedentary jobs available in the national economy. (AR at 859.)  Specifically, VE Lasoff testified Plaintiff could perform jobs classified as assembler, production inspector, and cuff folder. (A.R. at 860.)

VE Mark Remas testified at the February 2008 hearing.  Based upon the vocational profile and hypotheticals provided by the ALJ at that time, VE Remas testified no former work was available to Plaintiff.  (A.R. at 885.)  Similar to VE Lasoff's testimony, VE Remas testified Plaintiff could perform fifty percent of the unskilled sedentary work available in the national economy.  Specifically,  VE Remas testified Plaintiff could perform jobs classified as lens inserter, final assembler, and cuff folder. (A.R. at 886.)

Both vocational experts testified; if Dr. Harris' opinion regarding Plaintiff's work restrictions were accepted, Plaintiff would be precluded from performing any work. (A.R. at 864, 886.)

**ALJ's Medical Evidence Evaluation**

After a lengthy discussion of the medical evidence presented and a presentation of Plaintiff's testimony, the ALJ determined Plaintiff was not entitled to disability insurance benefits under the Act (A.R. at 749.) based upon the following findings:

1.  From January 17, 2001 through the date of his decision, Plaintiff did not engage in substantial gainful activity. (A.R. at 752.)

2. Plaintiff's cervical and lumbar degenerative disc disease, degenerative joint disease of the knees status post multiple surgeries, asthma, bilateral carpal tunnel syndrome status post surgical release, somatoform pain disorder, alcohol abuse, and polysubstance abuse are considered

"severe" based on the requirements in the Regulations [citation omitted]. (Id.)

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in [the Social Security Regulations.] (Id.)

4. The ALJ finds that, from January 1, 2001 through October 1, 2001, the Plaintiff had the residual functional capacity to perform less than sedentary work.  The undersigned gives the Plaintiff the benefit of the doubt that she was only capable of performing limited range of less than sedentary work. (A.R. at 754.)  The Plaintiff was unable to perform any of her past relevant work during this time. (Id.)

5. Medical improvement occurred as of October 2, 2001. (A.R. at 755.) The undersigned finds Plaintiff's functional capacity for basic work activities has increased. (A.R. at 761.)

6. Beginning on October 2, 2001 through November 31, 2003, Plaintiff has not had an impairment or combination of impairments that meets or medically equals on of the impairments. (A.R. at 756.)

7. The ALJ finds the Plaintiff's allegations regarding her limitations during the period from October 2, 2001 through November 31, 2003, are not totally credible for the reasons set forth in the body of the decision.

8. From October 2, 2001 through November 31, 2003, Plaintiff had the residual functional capacity to perform sedentary work except she was able to lift and carry ten pounds occasionally and less than ten pounds frequently; stand for 3-4 hours and sit for six hours in an eight hour day; occasionally climb stairs and ramps, balance, and stoop, but never climb ropes, ladders or scaffolds and no frequent kneeling, crawling, or squatting; frequently but not continuously or repetively finger and feel; unrestricted in reaching; occasionally keyboard and type; and had to avoid concentrated exposure to pollutants.   She was limited to simple, low stress activities in supportive environment.

9.  The ALJ finds that, beginning on December 1, 2003, through March 1, 2005, Plaintiff had the residual functional capacity to perform less than sedentary work.  The ALJ finds that beginning December 1, 2003 through March 1, 2005, Plaintiff's allegations regarding her symptoms and limitations are generally credible. (A.R. at 762.)

10.  Beginning on December 1, 2003, through March 1, 2005, Plaintiff was unable to perform past relevant work. (A.R. at 765.)

11.  From December 1, 2003, through March 1, 2005, there were no jobs that existed in significant numbers in the national economy Plaintiff could have performed.

12.  Plaintiff  was under a disability from December 1, 2003 through March 1, 2005.

13. Medical improvement occurred as of March 1, 2005, the date Plaintiff's disability ended.

14.  Beginning on March 1, 2005, Plaintiff has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in [the Social Security Regulations].

15.  The ALJ finds that beginning on March 1, 2005, Plaintiff has had the residual functional capacity to perform sedentary work ... she is able to lift and carry ten pounds occasionally and less than ten pounds frequently; stand for 3-4 hours at 1.5 hours at a time and sit for six hours in an eight hour day; occasionally climb stairs and ramps, balance, and stoop, but never climb ropes, ladders or scaffolds; cannot frequently kneel. crawl, or squat; can frequently but not continuously or highly repetitive finger and feel; is unrestricted in reaching; occasionally keyboard and type; and must avoid concentrated exposure to cold, pollutants, industrial vibration, and hazards.  She is limited to simple, low stress activities in a supportive environment. (A.R. at 768.)

16.  Beginning March 1, 2005, considering Plaintiff's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy.  (A.R. at 773.)  Plaintiff's disability ended on March 1, 2005. [citation omitted.]

**Plaintiff's Claim on Appeal**

Plaintiff asserts four claims: 1) The ALJ failed to address substantial evidence establishing Plaintiff's obesity ; 2) The ALJ's decision failed to adequately reject the opinions of Plaintiff's treating physicians; 3) The ALJ failed to establish medical improvement; 4) The ALJ failed to resolve conflicts in the testimony of the vocation expert; 5) The ALJ failed to establish Plaintiff

1   was able to perform work from October 2, 2001 to November 30, 2003.

2   **1) Plaintiff's Obesity**

3   Plaintiff contends the ALJ failed to consider the impact of her obesity with her other

4   multiple impairments on her ability to work.  (Pl. MSJ at 4.) Specifically Plaintiff contends "[t]he

5   ALJ ignored substantial evidence that Plaintiff's obesity was a severe impairment that imposed

6   functional limitations." (P's MSJ at 4.)

7   Defendant contends Plaintiff failed to present obesity related limitations in her argument

8   claiming disability. (Def's MSJ at 5.)    Specifically, Defendant asserts Plaintiff did not present any

9   evidence or argument at the hearing to support her claim that her obesity in conjunction with her

10  other serious medical impairments renders her disabled and entitled to benefits.

11  The Ninth Circuit has held "[t]he ALJ in a social security case has an independent 'duty to

12  fully and fairly develop the record and to assure that the claimant's interests are considered.'"

13  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).  Obesity is a complicated, chronic and

14  often misunderstood disease which the Commissioner must scrutinize carefully pursuant to SSR

15  02-01p."  *Phillips v. Barnhart*, 421 F.Supp. 2d 272, 282 (D.Mass 2006).  Social Security Ruling

16  02-1P, 2000 WL 628049 (S.S.A.) states in pertinent part:

17  **Because there is no listing for obesity, we will find...that a listing is met**

18  **if there is an impairment that, in combination with obesity, meets the**

19  **requirements of a listing.  For example, obesity may increase the severity of**

20  **coexisting or related impairments to the extent that the combination of**

21  **impairments meets the requirements of a listing.  This is especially true of**

22  **musculoskeletal, respiratory, and cardiovascular impairments. ...**

23  **Obesity in combination with another impairment may or may not**

24  **increase the severity or functional limitations of the other impairment. We will**

25  **evaluate each case based on the information in the case record.**

26  SSR 02-1p.

27  Well on point here is *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003).  The Court held "the ALJ

28  was responsible for determining the effect of Celaya's obesity upon her other impairments, and its

- 13 -

effect on her ability to work and general health, given the presence of those impairments." *Id*. at 1182.  After *Celya*, the Ninth Circuit again addressed the issue of whether the ALJ adequately considered plaintiff's obesity in *Burch v. Barnhart*, 400 F 3d 676, 681 (9th Cir. 2004). While the record revealed the claimant was obese, the Ninth Circuit in <u>Burch</u> held an "ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Id*. at 683.

In this case, several factors weigh against finding the ALJ erred.  First, with the exception of Dr. Weilepp's testimony the medical record is silent about her weight and whether and to what degree Plaintiff's weight affects her condition.  Second, obesity is not raised in Plaintiff's report of symptoms.  Third, it does not appear from the evidence in the record that Plaintiff is at the "extreme" end of obesity.  Indeed, Dr. Weilepp testified that after March 2005, Plaintiff was only "moderately" overweight.  Finally, and most importantly, at the August 2007 hearing Plaintiff's counsel spent significant time questioning the medical expert about Plaintiff's ability for gross manipulations. (A.R. at 851-856.)  In contrast, Plaintiff's counsel appears never to have addressed Plaintiff's alleged work restrictions based upon her weight.  Even at the February 2008 hearing Plaintiff's counsel failed to raise the issue of Plaintiff's weight as a factor in her disability. (A.R. at 881.)  Thus, Plaintiff simply fails to direct the Court's attention to any evidence in the record to support a finding that Plaintiff was disabled on account of her alleged obesity in combination with any other impairment.

Furthermore, the Court finds the ALJ's failure to specifically include obesity in combination with Plaintiff's other impairments is harmless error.  The Ninth Circuit has held, "[w]e recognize harmless error applies in the Social Security context. *Stout v. Commissioner Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006).  A finding of harmless error has been upheld "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion." *Id*.  That the ALJ incorporated Dr. Weilepp's opinions (including his opinion regarding her weight) into his own formulation of Plaintiff's RFC shows Plaintiff was not prejudiced by the ALJ's lack of specificity regarding her weight.  Similarly, the ALJ's ultimate

determination that Plaintiff had the residual functional capacity to perform only sedentary work demonstrates any specific reference to obesity was irrelevant to the ALJ's disability conclusion. For example, sedentary jobs are defined, in part, when "walking and standing are required only occasionally and all other sedentary criteria are met." DICOT 713.687-026. This aspect of Plaintiff's RFC fits well within Plaintiff's physical limitations as evidenced by the information presented in the record, including the testimony of Dr. Weilepp.

For these reasons, it is recommended Plaintiff's motion for summary judgment on her claim that the ALJ committed error for failure to specifically address her obesity be **DENIED**.

### 2) Non-treating vs. Treating physicians

Plaintiff contends the "ALJ failed to properly reject the treating physicians's opinion of Plaintiff's limitations with specific and legitimate reasons based upon substantial evidence in the record." (P's MSJ at 8.) Specifically, Plaintiff argues "[t]he ALJ failed in his duty to provide specific and legitimate reasons to reject the opinions of Drs. Harris and Rubino." (Id.) Plaintiff cites the Ninth Circuit case of *Lester v. Chater*, 81 F. 3d 821, 830-31 (9th Cir 1995) for the proposition the opinion of an examining physician can only be rejected for specific and legitimate reasons supported by substantial evidence in the record, even if contradicted by a non-examining doctor. *Id.*

Defendant argues it was not error for the ALJ to discount Drs. Harris and Rubino's opinions because they were inconsistent with the record as a whole. Defendants also contend the ALJ provided numerous reasons supported by substantial evidence in the record. (Def. at 6.) As noted by Defendant "[t]he ALJ noted that the opinions that Plaintiff was always incapable of even sedentary work was inconsistent with other evidence in the record." (Id.) Moreover, Defendant points out "[t]he ALJ referred to other medical sources who did not find Plaintiff to be totally disabled including Steven E. Gerson, D.O., S.C. Swan, M.D., George C. Spellman, M.D., and Thomas Sabourin, M.D." (Id. at 7.)

The Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those who treat the claimant ("treating physicians"); (2) those who examine but do not treat the claimant ("examining physicians"); and (3) those who neither examine nor treat the claimant

1   ("nonexamining physicians").  *Lester v. Chater,* 81 F3d 821, 830 (9th Cir. 1996).  As a general

2   rule, more weight is given to the opinion of a treating source than to that of a nontreating

3   physician.  *Id.* (citing *Winans v. Bowen,* 853 F2d 643, 647 (9th Cir. 1987)).  Likewise, the opinion

4   of an examining physician is typically entitled to greater weight than that of a nonexamining

5   physician.  *Pitzer v. Sullivan,* 908 F.2d 502, 506 (9th Cir. 1990).

6          The Ninth Circuit examined the weight to be given a treating source opinion in *Orn v.*

7   *Astrue*, 495 F.3d 625 (9th Cir.  2007)   The Ninth Circuit held "[i]f a treating physician's opinion is

8   not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with

9   other substantial evidence in the record, the Administration considers specific factors in

10  determining the weight it will be given.  Those factors include the 'length of the treatment

11  relationship and the frequency of examination' by the treating physician; and the 'nature and

12  extent of the treatment relationship' between the patient and the treating physician.  Generally, the

13  opinions of examining physicians are afforded more weight than those of non-examining

14  physicians, and the opinions of examining non-treating physicians are afforded less weight than

15  those of treating physicians." *Id.*  at 631.

16         Where a non-treating, non-examining physician's opinion contradicts the treating

17  physician's opinion, the ALJ may only reject the treating physician's opinion "if the ALJ gives

18  specific, legitimate reasons for doing so that are based upon substantial evidence in the record."

19  *Jamerson v. Chater*, 112 F.3d. 1064, 1066 (9th Cir. 1997) (quoting *Andrew v. Shalala*, 53 F3d

20  1035, 1041 (9th Cir. 1995)).  "The ALJ may meet this burden by setting out a detailed and thorough

21  summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

22  making findings."  *Morgan v. Apfel*, 169 F.3d 595, 600-601 (9th Cir. 1999) (citing *Magallanes*,

23  *supra*, 881 F.2d at 751)).  Additionally, "[r]eports of consultative physicians called in by the

24  Secretary may serve as substantial evidence." *Andrews*, *supra*, 53 F.3d at 1041.  Where medical

25  reports are inconclusive, "questions of credibility and resolution of conflicts in the testimony are

26  functions solely of the Secretary.'" *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)

27  (quoting *Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971)).

28         An noted herein, the ALJ in this case initially set forth his reasons why he did not fully

credit Dr.Harris' and Dr. Rubino's opinions as treating physicians.  In his analysis the ALJ cited to substantial evidence in the record to support his reasons not to give controlling weight to the opinions of Drs. Harris and Rubino regarding Plaintiff's ability to sustain employment. In *Orn*, *supra*, the ALJ's reasons for rejecting the treating physician's opinion were actually contradicted by the record in that case.  *Orn v. Astrue*, 495 F.3d at 634.  In contrast, the ALJ here specifically cited to inconsistencies between the opinions of Drs. Harris and Rubino and other evidence presented in the record, including "substantial evidence of record , documenting less severe limitations." (A.R. at 760.)  "The doctor failed to cite any medical testing results or objective observations to support his conclusions as to the claimant's residual functional capacity." (Id.; see also A.R. at 771.)

The ALJ next set forth the evidence presented in the record he used to determine Plaintiff has not been under a disability.  As presented herein, the ALJ relied on the opinions of virtually all the physicians (treating and non-treating, examining and non-examining) to support his conclusion Plaintiff is not disabled.  Specifically, the record indicates none of the non-treating or non-examining physician's opinions contradicted the treating physician's opinions with the exception of Drs. Harris and Rubino's statements that Plaintiff is unable to function in the competitive job market. (A.R. at 760-761, 768-773.)  Overall, the great majority of physicians in this case who either treated, examined or reviewed Plaintiff's medical condition made findings consistent with the ALJ's residual functional determination.  Accordingly, the Court finds the ALJ's finding is supported by substantial evidence and free of legal error and recommends Plaintiff's motion on this ground be **DENIED**.

### 3) The ALJ failed to establish medical improvement

Plaintiff also contends "[t]he ALJ's discussion failed to provide evidence that Plaintiff was no longer disabled as of October 2, 2001 due to improvements in Plaintiff's residual functional capacity." (P's MSJ at 13.)  Plaintiff relies on various reports of treating physician Dr. Harris.  For example, Plaintiff cites Dr. Harris' report of October 29, 2001 referring to "numerous ongoing medical impairments and limitations."  (Id.)

Defendant contends '[t]he ALJ ...  provided substantial evidence of medical improvement

1   and his conclusion should be upheld regardless of Plaintiff's disagreement ." (Def. MSJ at 8.)  For

2   example, Defendant points out the ALJ's citation to the reports of Dr. Harris (A.R. at 226, 775.),

3   Dr. Greenfield (A.R. at 293-295) and Dr. Gerson (A.R. at 316-317.)  According to the ALJ these

4   physicians all noted improvements in Plaintiff's physical condition.  The ALJ pointed to evidence

5   in the record Plaintiff exhibited only slight knee pain (A.R. at 227.)  Plaintiff's knee was stable

6   (A.R. at 227.)  Plaintiff's MRI showed normal menisci without tears (A.R. at 299.)  Plaintiff has

7   full range of motion in her knee and a stable gait (A.R. at 316) and almost   normal strength in her

8   knee with no atrophy.  (A.R. at 756, 184.)

9     There is substantial evidence in the record supporting the ALJ's finding of medical

10   improvement after October 2001.  Despite Plaintiff's protestations and her own citations to the

11   record in support of her claim; "[w]here the evidence is susceptible to more than one rational

12   interpretation, we must uphold the ALJ's conclusions."  *Tommasetti v. Astrue*, 533 F.3d 1035,

13   1038 (9th Cir. 2008).  "Thus, even if the weight of the evidence is against the ALJ's conclusion, so

14   long as there is substantial evidence to support the conclusion, we must affirm." *Pearson v. Astrue,*

15   *2010 WL 76446* (9th Cir. 2010).[4]  It is recommended Plaintiff's motion for summary judgment on

16   this claim be **DENIED**.

17     **4) Error regarding the Vocational Expert**

18     Plaintiff argues the ALJ failed to resolve conflicts in the testimony of the Vocational

19   Expert ("VE").  Specifically, she contends the physical demands of the jobs identified by the VE,

20   and adopted by the ALJ, as other work Plaintiff can perform (e.g. lens inserter, final assembler and

21   cuff folder) exceed Plaintiff's limitations. (P.'s MSJ at 18.)  In response, Defendant contends

22   "there is no conflict between the vocational expert's testimony and the DOT." (Def. MSJ at 8.)

23     From October 2, 2001 through November 31, 2003 the ALJ found Plaintiff's residual

24   functional capacity ("RFC") was as follows:

25      **[A]ble to lift and carry ten pounds occasionally and less than ten**

26      **pounds frequently; stand for 3-4 hours and sit for six hours in an eight hour**

27

28      [4] The Court may cite unpublished Ninth Circuit opinions issued on or after 01/01/07. U.S. Ct. App. 9th Cir. Rule
36-3(b).

**day; occasionally climb stairs and ramps, balance, and stoop, but never climb ropes, ladders or scaffolds and no frequent kneeling, crawling, or squatting; frequently but not continuously or repetitively finger and feel; unrestricted in reaching; occasionally keyboard and type; and had to avoid concentrated exposure to pollutants. ... limited to simple, low stress activities in supportive environment. (A.R.at 757.)**

Further, March 1, 2005 the ALJ found Plaintiff's RFC was as follows:

**[A]ble to lift and carry ten pounds occasionally and less than ten pounds frequently; stand for 3-4 hours at 1.5 hour intervals at a time and sit for six hours in an eight hour day; occasionally climb stairs and ramps, balance, and stoop, but never climb ropes, ladders or scaffolds, cannot frequently  kneel, crawl, or squat; can frequently but not continuously or highly repetitively finger and feel; is unrestricted in reaching; occasionally keyboard and type; and must avoid concentrated exposure to cold, pollutants, industrial vibration, and hazards.  She is limited to simple, low stress activities in a supportive environment. (A.R. at 768.)**

A review of the exertional requirements for the three occupations cited by the VE all fall within Plaintiff's exertional limitations. For example, none require climbing, balancing, stooping, kneeling, crouching, or crawling. *See* DICOT  713.687-026, 713.687-018, 685.687-014. Further, only frequent reaching, handling and fingering is present in each occupation. *Id*.  Lastly, all are categorized as sedentary work. *Id*.  Here, Plaintiff has failed to adequately demonstrate the existence of ambiguities in the record between Plaintiff's RFC and the occupations cited by the VE as suitable for Plaintiff.  Therefore, it is recommended Plaintiff's claim for summary judgment on this ground be **DENIED**.

**5) ALJ erred in finding Plaintiff able to work from October 2, 2001 through November 30, 2003**

Plaintiff contends the ALJ "failed to identify any job positions for the time period from October 2, 2001, to November 31 (sp) 2003." (P's MSJ at 20.)  Specifically, Plaintiff asserts the

ALJ's decision did not identify any positions Plaintiff could perform with her functional limitations from during the time period from October 2001 through November 2003. The record transcript shows the ALJ expressly asked the VE[5] about the period from October 2001 through November 2003 what jobs would be available given Plaintiff's RFC :

**VE: That would rule out past relevant work, Your Honor, because this would be essentially at a sedentary work level. Past work was light or medium. So that would rule it all out. Within this hypothetical, there would be other work available.**

**ALJ: Of the 200 sedentary, unskilled, how many would available?**

**VE: 50 percent, Your Honor.**

**ALJ: And the illustrations of those would be what?**

**VE: Lens inserter, 713 –**

**ALJ: Next job title?**

**VE: Final assembler.**

**ALJ: All right. The third one?**

**VE: A cuff folder. (A.R.at 883-886.)**

The testimony of vocational expert Mark Remas is clear. He specifically identifies the three occupations cited herein as available to Plaintiff from October 2, 2001 to November 31, 2003. Additionally, within the section of his decision addressing Plaintiff's RFC between October 2001 and November 2003, the ALJ noted the vocational expert testified "given all of these factors the individual would be able to perform the requirements of representative occupations such as the following ...lens inserter, final assembler, cuff folder." (A.R. at 762..)

Thus, substantial evidence supports the ALJ's conclusion jobs within Plaintiff's capabilities exist in the national market. For these reasons, Plaintiff's allegation of error on this ground is unsupported by the record in this case. According, it is recommended Plaintiff's motion for summary judgment be **DENIED** on this ground.

*///*

---

[5] The transcript indicates "ME" to designate the testimony of vocational expert Mr. Remas. A thorough review of the transcripts indicates that the "ME" designation for Mr. Remas is a typographical error.

**CONCLUSION**

Accordingly, it is recommended that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Cross-Motion for Summary Judgment be **GRANTED.**

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to the this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties no later than **February 22, 2010**.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 1, 2010**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  February 8, 2010

Hon. William McCurine, Jr.
U.S. Magistrate Judge
United States District Court